***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before the Deputy Commissioner and the briefs and argument before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence or rehear the parties or their representatives. Accordingly, the Full Commission affirms, with modifications, the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. At all relevant times, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. At all relevant times, an employer-employee relationship existed between plaintiff and defendant-employer. *Page 2 
3. At all relevant times, defendant-employer was insured for injuries sustained under the Workers' Compensation Act by Travelers Insurance Company.
4. All relevant Industrial Commission forms.
5. All medical records relating to plaintiff's back injuries and treatment.
6. Average weekly wage prior to the date of injury is stipulated to be $2,307.69. Defendants have denied the claim and have paid no medical or indemnity compensation.
7. The issues for determination are:
 a. Whether plaintiff suffered an injury to his low back?
 b. If so, to what benefits is plaintiff entitled?
 c. Whether plaintiff was initially disabled from earning wages in this employment?
 d. If so, have defendants shown that plaintiff was terminated for reasons unrelated to the injury?
 e. If so, has plaintiff shown that he remains disabled regardless of the reasons for termination?
 f. Whether plaintiff is entitled to medical compensation for psychological problems?
 g. Whether plaintiff is entitled to attorney's fees for the unreasonable denial of these claims?
 h. At the hearing before the Deputy Commissioner, it was held that defendants could present written arguments on the issue of whether *Page 3 
extraordinary circumstances exist to justify an alternate method of determining plaintiff's average weekly wage.
 *********** EXHIBITS
1. The parties stipulated the following documentary evidence:
 a. Stipulated Exhibit #1: Medical records
 b. Stipulated Exhibit #2: I.C. Forms
2. In addition to Stipulated Exhibits, the following Exhibits were admitted into evidence:
 a. Plaintiff's Exhibit #1: Email correspondence, Feb — June 2005
 b. Plaintiff's Exhibit #2: Discovery responses
 c. Plaintiff's Exhibit #3: Job search update
 d. Defendants' Exhibit #1: Email
3. Subsequent to the hearing before the Deputy Commissioner, the following exhibits were offered by plaintiff:
 a. Plaintiff's Exhibit #1, dated 4/21/06: Plaintiff's statement of the circumstances surrounding the injury; and
 b. Plaintiff's Exhibit #2, dated 4/21/06: Additional medical records.
4. Attached to the deposition transcript of Dr. James R. Alexander are the following deposition exhibits:
 a. Deposition Exhibit #1: Additional medical record; and
 b. Deposition Exhibit #2: Correspondence and written responses.
 *********** *Page 4 MOTION
At the hearing before the Deputy Commissioner, defendants moved for a protective Order regarding specific documents produced during discovery. Following review of the documents, the Deputy Commissioner issued an Order dated March 22, 2006, in which the documents were deemed protected as work product in preparation for trial and not subject to discovery. Further, it was determined that the information contained in the documents pertained to an issue that was rendered moot by the testimony offered by defendants at the hearing. The documents were placed in a sealed envelope, which is hereby made a part of the record in this case.
 ***********
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 54 years old. Plaintiff earned an undergraduate degree from the University of Rochester in New York in 1972 and a Master's degree in Business Administration from the University of Southern California in 1982. Plaintiff has spent the majority of his working life in the furniture industry.
2. Defendant-employer contracts with factories, primarily in China, to produce furniture, which it then markets. One of the two co-owners of the company, Al Schwerin, has known plaintiff for 30 years and is very familiar with his expertise in the furniture industry.
3. In 1968, plaintiff had back surgery at L4-5. As the medical evidence revealed, plaintiff has experienced continuing back spasms and accompanying pain that he controlled through the use of medication since that surgery. *Page 5 
4. Plaintiff was hired as a "sourcing agent" for defendant-employer. The sourcing agent works with the factories he or she represents to obtain contracts for those factories to manufacture furniture and to ensure that the quality of the manufacture and specifications provided by the contracting company are met by the factory. Plaintiff's job duties involved monthly trips to China where he visited the factories that manufactured defendant-employer's furniture products. When not in China, plaintiff worked out of his home in Waxhaw, North Carolina.
5. At the time plaintiff was hired, all of defendant-employer's "Encore!" line of home entertainment furniture and home theater seating was contracted through a sole sourcing agent, Sunny Lu. The factories represented by Mr. Lu were troubled by constant problems with product quality. The primary reasons that Mr. Schwerin hired plaintiff were to help correct the manufacturing problems at Lu-represented factories and develop other factories through other sourcing agents to produce new product and possibly move existing product away from the Lu factories. This was a new position with defendant-employer that was created specifically for plaintiff based on his known experience and talents.
6. In addition to his on-site reviews of product construction, plaintiff reviewed furniture designs and consulted with defendant-employer and the factories on design changes to ensure that the furniture produced accomplished its intended purpose, had specific features and was attractive to the consumer. Plaintiff also attended periodic furniture shows in High Point, North Carolina, and Las Vegas, Nevada. He cultivated working relationships with sourcing agents Craig Vanderhorst, Oree Frits and Lily Bai to explore development of new factories that had the capability of building furniture to the acceptable quality level in preparation for potential moves of furniture manufacture from Lu-represented factories. *Page 6 
7. Prior to February 2005, it became clear that plaintiff and Mr. Lu had differences with regard to plaintiff's methods in achieving product quality at Lu-represented factories. As a result of these differences and a personal confrontation between plaintiff and Mr. Lu, Mr. Lu forbade plaintiff from performing quality control in Lu-represented factories. In January 2005, plaintiff and defendant-employer, primarily Mr. Schwerin, were engaged in discussions regarding how plaintiff could remain useful to defendant-employer in light of the differences between plaintiff and Mr. Lu and how plaintiff's compensation might subsequently be affected. Before plaintiff left for his trip to China in February 2005, plaintiff knew that there was a likelihood his wages would be lowered, but Mr. Schwerin indicated that negotiations would continue after plaintiff returned from his trip. The purpose of that trip was to develop further contacts with non-Lu sourcing agents and their factories.
8. On February 25, 2005, plaintiff had been in China for two or three days when he was scheduled to meet with Mr. Vanderhorst, a sourcing agent and the manager of a factory. The group, consisting of Mr. Vanderhorst, the manager, his secretary and the driver came to pick up plaintiff in a compact or subcompact automobile. Plaintiff sat in the passenger side of the rear seat with two others seated beside him. Plaintiff maintains that he sat up against the side of the automobile with his right hip higher than the left. After approximately 15 minutes of travel, plaintiff was feeling significant pain in his lower back and had to ask to transfer to the front where there was more room. There was no evidence presented regarding any specific occurrence during the trip that caused plaintiff's back pain.
9. Plaintiff testified that following the car ride, his pain subsided while walking around the factory. During lunch, plaintiff's back pain increased from sitting on a hard wooden *Page 7 
seat in a traditional Chinese restaurant. His low back pain returned the next day during a flight on a commuter plane that had little or no cushioning in the seat.
10. Plaintiff testified that on February 28, 2005, his right leg "seized up on him" as he walked across a street. Plaintiff realized that he was no longer able to perform his job duties and presented to a Chinese hospital for acupuncture treatment. When the treatment proved unsuccessful, plaintiff made arrangements to return to the United States.
11. Shortly after plaintiff returned home to Charlotte, North Carolina, he was taken by ambulance to Carolinas Medical Center — Pineville, where he was given some pain medication. Due to his immobility, plaintiff remained overnight on a gurney and was wheeled the next morning across the parking lot to his family physician, Dr. Eric Landis.
12. On March 3, 2005, plaintiff presented to physical medicine and rehabilitation specialist, Dr. Robert Giedraitis, upon referral from Dr. Landis. Plaintiff presented with extreme back and right leg pain and gave a history of development of the condition during a recent trip to China. Dr. Giedratis began a series of two epidural injections that provided some short-term benefit lasting approximately four hours. After obtaining a CT, myelogram and MRI that revealed a herniated disc at L3-4, Dr. Giedraitis referred plaintiff to Dr. Paul Tsahakis, an orthopedic surgeon, for a consultation.
13. Dr. Giedraitis noted that he had no knowledge of plaintiff's pre-treatment condition and plaintiff did not relate an event such as a fall as a factor in the onset of his back pain, but only that his back seized up while walking across a street. Accordingly, Dr. Giedraitis opined that he could not causally relate plaintiff's current back condition to a specific traumatic event. Dr. Giedraitis testified that plaintiff reported the temporal nature of what happened but not a specific thing that he had done. *Page 8 
14. Dr. Tsahakis reviewed plaintiff's current MRI and compared it to one taken on February 10, 2003. The earlier MRI also showed a herniated disc a L3-4. Dr. Tsahakis opined that there was no significant change between the two MRIs, and he was unable to offer an opinion as to what definitively caused the increase in plaintiff's symptoms. Although Dr. Tsahakis acknowledged that it seemed logical that plaintiff's symptoms increased during the activities described by plaintiff, the only causal connection he could make was temporal. Dr. Tsahakis could only opine that the circumstances of plaintiff's trip to China could have caused his subsequent back problems. He further opined that it was possible that plaintiff's herniated nucleus pulposus at L3-4 could also have occurred prior to plaintiff's trip to China.
15. On March 30, 2005, Dr. Tsahakis performed a bilateral discectomy, laminotomy, facetectomy and foraminotomy at L3-4.
16. After plaintiff's return and while he was awaiting back surgery in March 2005, he completed negotiations with Mr. Schwerin regarding his position with defendant-employer. It was determined that plaintiff's monthly compensation would be reduced from $10,000.00 to $5,000.00 and he would be entitled to a 1% "override" or commission on defendant-employer's cost of all products shipped from non-Lu factories. The override would go towards the $5,000.00 monthly salary and if it exceeded that amount, the additional amounts would be paid to plaintiff. Plaintiff was to continue all the job tasks he had performed previously that did not involve Sunny Lu-represented factories and he maintained a right to independently obtain what was called OEM (original equipment manufacturer) business, which would then be run through defendant-employer with a commission to plaintiff.
17. This new contractual arrangement was determined with the assistance and recommendation of plaintiff's supervisor, Rich Serlin, and was agreed to by Mr. Schwerin. At *Page 9 
the hearing before the Deputy Commissioner, Mr. Schwerin testified that upon reaching the new agreement with plaintiff in March 2005, he felt that plaintiff would be able to justify his continued employment under the new arrangement.
18. In early June 2005, Mr. Schwerin, Mr. Cosserelli, and Rich Serlin met at defendant-employer's Las Vegas, NV showroom to hold their regularly scheduled quarterly meeting of upper management. During this meeting the decision was made to eliminate plaintiff's position because it was not economically feasible to pay plaintiff's $5,000 per month salary plus travel costs to Asia each month to develop new business and new manufacturing when one of these three upper managers and owners of defendant-employer was also traveling to Asia each month to manage and monitor the Sunny Lu-represented factories. In addition, it was decided to have a China-based manufacturing team near the plant to provide quality control.
19. On June 9, 2005, Al Schwerin called plaintiff to advise him that his position had been eliminated for the economic reasons outlined above. Plaintiff was paid his new salary of $5,000 per month through July 2005. The Full Commission finds Mr. Schwerin to be a credible witness.
20. On July 15, 2005, plaintiff completed Industrial Commission Form 18, Notice of Accident to Employer and Claim of Employee, which was subsequently sent to defendants.
21. Based on the evidence of record, Full Commission finds as fact that plaintiff was terminated from employment with defendant-employer for reasons unrelated to his back condition.
22. On June 3, 2005, Dr. Tsahakis released plaintiff to attempt return flights to China as tolerated. Plaintiff flew to China in June 2005, October 2005 and February 2006. Plaintiff also took various other flights within the continental United States after his back surgery. *Page 10 
23. Approximately two months after his June 2005 flight to China, plaintiff returned to Dr. Tsahakis with reports that his leg pain had resolved. The trip involved 35 hours in total flight time, during which plaintiff experienced a flare-up that ultimately resolved. Dr. Tsahakis recommended that plaintiff should not attempt a second flight to China before October 2005.
24. On September 7, 2005, Dr. Tsahakis reviewed a post-surgical MRI and noted that the previously herniated disc was no longer identified and the central canal was significantly improved with only a mild residual central stenosis remaining. Dr. Tsahakis thereafter referred plaintiff to Dr. Giedraitis for any continuing complaints.
25. On September 19, 2005, Mr. Thomas Campion, a physical therapist, performed an initial physical therapy evaluation and functional capacity evaluation (FCE) for plaintiff. Testing results revealed that plaintiff was able to perform in the light to medium physical demand category.
26. On October 10, 2005, plaintiff presented to Dr. James Alexander, a physical medicine, rehabilitation and pain specialist, with complaints of back spasms and right leg pain that had been occurring on and off for ten years. Dr. Alexander testified that plaintiff told him he had significant back pain as he was returning from China. Dr. Alexander began plaintiff on a lumbar stabilization program and physical therapy along with medication.
27. Dr. Alexander opined that he was unable to say without predating and post-dating imaging whether plaintiff's problems were related to his 1968 surgery or occurred later.
28. Dr. Alexander eventually referred plaintiff to surgeon, Dr. Eric Laxer, to whom plaintiff presented on February 20, 2006. Dr. Laxer opined that plaintiff is not currently a candidate for further surgery and will not be, absent a change in his MRI associated with his symptoms. *Page 11 
29. Dr. Laxer further opined that it was possible that events such as riding in a car, sitting in a chair or walking could have aggravated plaintiff's pre-existing condition, but it was his understanding that none had been previously identified at the L3-4 site. Dr. Laxer could not point to a specific event reported to him by the plaintiff that resulted in plaintiff's condition. He could only opine that it was possible that the events in China may have caused the herniation that he later diagnosed.
30. The Full Commission finds that there is no evidence of a traumatic incident causing the onset of plaintiff's back pain. Moreover, there is no medical testimony that does more than establish a temporal relationship between the activities mentioned by plaintiff and his current back complaints.
31. Plaintiff suffered significant back problems as early as 1968 that never resolved but were controlled by medication. An MRI of plaintiff's lumbar spine taken on February 10, 2003 showed the same ruptured disc at L3-4 as was the subject of the operation on March 30, 2005. Furthermore, Dr. Tsahakis opined that the MRI taken prior to surgery showed no appreciable difference in plaintiff's back condition from the 2003 MRI.
32. The Full Commission finds that the competent evidence of record fails to establish that plaintiff's back pain and resulting disability were causally related to his February 2005 trip to China or that his trip significantly aggravated his pre-existing back condition.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following: *Page 12 
 CONCLUSIONS OF LAW
1. Plaintiff did not sustain an injury by accident or a specific traumatic incident that arose out of and in the course of his employment on or about February 25, 2005. N.C. Gen. Stat. § 97-2(6).
2. Therefore, plaintiff is not entitled to any workers' compensation benefits for an alleged injury by accident or specific traumatic incident. Id.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 A W A R D
1. Plaintiff's claim for benefits under the Act must be and is hereby DENIED.
2. Each side shall bear its own costs.
This the ___ day of July 2007.
 S/________________ PAMELA T. YOUNG COMMISSIONER
CONCURRING:
S/________________ DANNY LEE McDONALD COMMISSIONER
S/________________ DIANNE C. SELLERS COMMISSIONER